UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10112-GAO

KAREN M. ROCK,
Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
Defendant.

<u>OPINION AND ORDER</u>
March 29, 2013

O'TOOLE, D.J.

  Karen Rock appeals the denial of her application for Social Security Disability Insurance benefits ("DIB") and Supplemental Security Income ("SSI") by the Commissioner of the Social Security Administration ("Commissioner"). Rock applied for DIB and SSI benefits on January 31, 2007, claiming that she had become disabled. (Administrative Tr. at 121-25, 126-32 [hereinafter R.].) Her claims were denied initially in June 2007 (<u>id.</u> at 58) and, upon review, by a Federal Reviewing Official in June 2008, (<u>id.</u> at 59-65, 66-68). Rock appealed to an administrative law judge ("ALJ"), (<u>id.</u> at 75-77), and a hearing was held on July 17, 2009, (<u>id.</u> at 18). After the hearing, the ALJ issued a written decision finding that Rock was not disabled. (<u>Id.</u> at 17.) The Decision Review Board did not complete its review of the ALJ's decision, and the ALJ's decision thus became the final decision of the Commissioner. (<u>Id.</u> at 1.) Rock subsequently appealed to this Court pursuant to 42 U.S.C. § 405(g).

  Before the Court are cross-motions to reverse, and alternatively to affirm, the decision of the Commissioner. Concluding that the administrative record substantially supports the ALJ's decision and that no error of law was made, the Court now affirms.

**I.**     **Background**

Born on December 26, 1965, Rock was 38 years old at the onset of her alleged disability. (Id. at 15, 36.) She has completed the ninth grade. (Id. at 37.) She had previously worked as a newspaper warehouse worker and a fisherman. (Id. at 15, 37-38.) Her disability claims are based on a combination of limiting physical conditions which include degenerative joint disease and chronic pain syndrome. (Id. at 10.)

   A.   Medical History

In May 2005, Rock underwent a physical examination. (Id. at 198.) At that time, she had no joint or bone symptoms, no weakness, no history of back problems, no history of difficulties in walking or balance, and no history of motor or sensory problems. (Id. at 199.)

In September 2006, Michael Merport, M.D., performed an MRI on Rock's lumbar spine. (Id. at 475.) The procedure revealed mild degenerative disc changes in the lower lumbar spine, facet arthropathy, and hypertrophy of the ligamentum flavum. (Id. at 475-76.)

In January 2007, Rock complained of back pain and headaches to her physician, John George, M.D. (Id. at 278.) He prescribed her Percocet and Fioricet for her pain and recommended to her that she lose weight through diet and exercise. (Id. at 279.)

Later that month, Rock applied to the Social Security Administration ("Administration") for DIB and SSI. (Id. at 121, 126.) She claimed that her disabling condition began on January 1, 2004. (Id. at 121, 126.)

In May 2007, Rock was examined by a rheumatologist, Aleksander Feoktistov, M.D., to evaluate her complaints of headaches and joint pains. (Id. at 212.) MRIs revealed diffuse mild cervical spondylosis and mild degenerative changes without spinal stenosis. (Id. at 213-14.) Dr. Feoktistov stated that Rock had signs and symptoms of fibromyalgia, symptoms of left carpal tunnel, and osteoarthritis of the left knee. (Id. at 214.) A physical examination revealed full range

of motion in her hips, crepitation in her left knee, full range of motion in her ankles and toes, increased pain in her lumbar spine, and tenderness to palpitation in her knees. (Id. at 213.)

In June 2007, Rock was examined by David Adelberg, M.D., after she twisted her right knee. (Id. at 241.) He opined that Rock suffered from a soft tissue injury. (Id.) Also that month, Adena Katz, M.D., concluded that an MRI of Rock's sacrum and coccyx was essentially unremarkable. (Id. at 244.) She concluded that an MRI of Rock's left knee revealed partial lateral discectomy, no evidence of T2 hyperintense recurrent meniscal tear, small joint effusion, and mild chondromalacia patella. (Id. at 472.)

Also in June 2007, a Disability Examiner at the Administration determined that Rock was not disabled. (Id. at 58.)

In July 2007, Rock was examined by Richard Jaslow, M.D., because of complaint of pain in her tailbone. (Id. at 245.) Although Rock said that she had to sit on one buttock or the other, the doctor reported that she was sitting straight on the examining table for half of the examination. (Id. at 245.) Dr. Jaslow opined that Rock had a chronic pain problem and that, because he is not a chronic pain physician, he had nothing to offer her. (Id. at 245.)

Also that month, Rock was examined by Jeremy Stern, M.D. (Id. at 246.) She had minimal swelling in her knee. (Id.) The doctor opined that she had a torn ACL but that she was a poor surgical candidate. (Id.) He sent her to physical therapy. (Id.)

In October 2007, Dr. Stern examined Rock again. (Id. at 247.) Rock reported that she had suffered a number of falls and a car accident and that she was in a lot of discomfort. (Id.) She also reported that she pretty much had pain all of the time and that her knees give way. (Id.) She had some question about being disabled. (Id.) Dr. Stern opined that she had a temporary condition of a torn ACL, that this condition could be corrected surgically, and that he did not think that Rock was permanently disabled from her knees. (Id.)

In November 2007, Dr. George completed a report for the Massachusetts Department of Transitional Assistance. (Id. 482, 488.) He completed a second one in January 2008. (Id. at 509-10, 515.) In both reports, he opined that Rock could not sit or stand for more than thirty minutes. (Id. at 486, 513.) In his second report, he opined that she could not walk for more than thirty minutes. (Id. at 513.) He opined, in both reports, that Rock's lumbar flexion was impaired and that she cannot lift more than fifteen pounds. (Id. at 486, 513.) He opined, in addition, that he expected the incapacitating condition to last for six to twelve months and that her impairment did not meet or equal the Department's medical standards or the SSI Listing of Impairments. (Id. at 483, 510.)

In January 2008, Rock was examined by Dr. Stern after her knee gave out and she had fallen and hit her left knee. (Id. at 527.) She reported that she was in quite a lot of pain. (Id.) After examining her MRI, Dr. Stern opined that it was normal and that she may have pain syndrome. (Id.) He referred her to a pain treatment center. (Id.)

In March 2008, Dr. Stern examined Rock again. (Id. at 528.) She reported that she was having a lot of pain in her left knee and that her right knee was giving out on her often. (Id.) The doctor noted that Rock had full range of motion in flexion and extension and good stability in the left knee. (Id.) He also noted that she had a full range of motion in flexion and extension, mild tenderness to palpitation diffusely through the right knee, and some decreased stability in the right knee. (Id.) He noted that her gait was mildly antalgic. (Id.) He injected her left knee with Lidocaine. (Id.)

Later that month, Dr. Jeffrey Swift, D.C., D.A.B.C.N., examined Rock for evaluation of chronic complaints involving her spine and hip region. (Id. at 517.) Rock rated her pain a level 8 out of 10 on a pain scale. (Id.) She reported that she had difficulty sitting, driving, rising in the morning, and rising from a seated position. (Id.) Dr. Swift opined that Rock had cervical

4

apophysitis, nonallopathic lesion thoracic spine, lumbar apophysitis, right trochanteric bursitis, and left hip synovitis. (Id. at 519.) He referred her to Dr. Roger Pocze, M.D. (Id.)

Later that month, Dr. Pocze examined Rock, who was complaining of hip pain. (Id. at 581.) He noted that she had some trochanteric bursitis and some symptoms of instability. (Id.) He opined that she had chronic lower back pain and that she had ruptured her ACL. (Id. at 583.) He injected her hips and expected those injections to give her prompt relief. (Id. at 581.)

In April 2008, Rock was examined by Dr. Matthew Kippe, M.D. (Id. at 520.) Rock complained of knee pain. (Id.) The doctor opined that Rock had a possible right knee ACL tear and noted that he did not see any meniscus tears. (Id.) He noted that her condition was aggravated by walking, standing, twisting, and exercise. (Id.) He noted, in addition, that her left knee showed some mild degenerative changes throughout and that her right knee showed mild narrowing of the medial compartment. (Id. at 586.) He recommended conservative treatment. (Id. at 520.)

Also that month, Rock attended a physical therapy evaluation. (Id. at 522.) Rock reported that she experienced pain at a level 8 out of 10. (Id.) Rock further reported that her symptoms were aggravated by sitting, walking, standing, and stairs. (Id.) The physical therapist recommended therapy two or three times a week for four to six weeks. (Id. at 523.) After her initial evaluation, Rock had one visit with the physical therapist and otherwise failed to keep her other appointments there. (Id. at 524.)

In June 2008, Rock was examined again by Dr. Kippe. (Id. at 525.) Rock reported that her symptoms were aggravated by sitting, walking, standing, stairs, and rising from a seated position. (Id. at 526.) Dr. Kippe recommended that Rock attend physical therapy and that she brace her left knee for strenuous work and activity. (Id. at 525.)

Also that month, David Tepper, a Federal Reviewing official, reviewed Rock's claim to the Administration for her alleged disability. (Id. at 59, 65.) He reviewed the medical evidence and other information, and as the Administration had found before, Tepper decided that Rock was not disabled. (Id.) Soon afterwards, Rock requested a hearing before an ALJ on her disability claim. (Id. at 75.)

In July 2008, Rock visited Dr. Stern's office. (Id. at 529.) She said that her right knee gave out a lot and that she had pain in it all the time. (Id.) She said that, for fear of her knee giving out, she had stopped doing what she normally did. (Id.) She stated, in addition, that her back was also bothering her quite a bit and that she did not wear her brace because it made her feel worse. (Id.) The doctor noted that she had swelling in her left knee, tenderness to palpitation of the lateral aspect of her right knee, and a full range of motion in flexion and extension of both knees. (Id.) She had mild, but not marked, instability in the right knee. (Id.) The doctor opined that Rock had an ACL tear on the right and left knee pain. (Id.)

In August 2008, Rock had MRI tests performed on her cervical, thoracic, and lumbar spine. (Id. at 532-37.) These tests indicated mild degenerative disc, facet, and uncovertebral changes and mild neuroforaminal narrowing but no significant central canal narrowing. (Id. at 533-34, 537.)

In October 2008, Rock was examined by Alvin Marcovici, M.D., for a neurosurgical consultation. (Id. at 617.) He opined that Rock's pain was unrelated to any specific spine disease. (Id.) He stated that there was no role for surgical intervention. (Id.) He questioned whether Rock had underlying rheumatologic conditions such as fibromyalgia. (Id.)

Later that month, Rock was examined by Dr. Stern. (Id. at 608.) Rock reported that she had fallen off her porch. (Id.) The doctor opined that she had sprained both of her ankles. (Id.)

The doctor recommended that Rock wear an Aircast and perform physical therapy for her ankles and knees. (Id.)

In December 2008, Rock had MRI tests performed on both of her ankles. (Id. at 631-34.) The tests indicated, in her left ankle, evidence of previous strain at left deltoid ligaments and previous tear of the anterior talofibular ligament and, in her right ankle, evidence of soft tissue ganglion or synovial cyst consistent with a prior lateral ankle ligament injury. (Id. at 632, 634.) Dr. Stern reviewed the MRIs and opined that Rock had mild ankle instability. (Id. at 610.) He recommended a conservative care program including icing, physical therapy, and bracing. (Id.)

In February 2009, Rock was examined by Dr. Pocze to whom she reported that her back pain was worse than ever. (Id. at 646.) Dr. Pocze recommended that Rock continue home exercises and activities as tolerated. (Id. at 647.)

In March 2009, Dr. Roland Chan, M.D. examined Rock for a rheumatology consultation. (Id. at 648.) He opined that Rock had chronic diffuse pain syndrome of unknown etiology and that she had no clear-cut symptoms or signs of rheumatic disease. (Id. at 649.)

In May 2009, Dr. Joseph Sheriden, D.C., examined Rock. (Id. at 660.) He opined that Rock could lift and carry up to 10 pounds occasionally and that, without interruption, she could sit for one hour, stand for ten minutes, and walk for fifteen minutes at a time. (Id.) He opined, in addition, that she could frequently reach and handle, continuously finger and feel, occasionally stoop, balance, and climb stairs, but never kneel, crouch, crawl, or climb ladders or scaffolds. (Id. at 661.) He concluded that Rock could not work an entire eight-hour workday. (Id. at 660.) He further concluded that Rock's pain was of such severity as to preclude sustained concentration and productivity which would be needed for full-time employment on an ongoing sustained basis. (Id. at 662.)

In June 2009, Dr. John Stamoulis, M.D., a neurologist, examined Rock. (Id. at 672.) He opined that Rock's examination was significant for sensory deficits suggestive of a peripheral neuropathy. (Id.)

In July 2009, ALJ Barry Best held a hearing on Rock's claim of disability and on her eligibility for Social Security benefits. (Id. at 18, 20.) Rock was represented by counsel at the hearing. (Id. at 18.) A number of people testified there: Rock, Dr. Stephen Kaplan, M.D., (a medical expert), and Paul Murgo (a vocational expert.) (Id. at 19.)

B.   Rock's Testimony

Rock testified at the hearing before the ALJ about the intensity of her pain and the functionally limiting effects of that pain. She said that she cannot stand for more than ten minutes and that sitting can be incredibly painful. (Id. at 40.) She spoke about the pain that she has in her neck, back, knees, and ankles and about suffering horrible headaches. (Id.) She further testified that, during the day, she basically watches television. (Id. at 43.) She said that she does housework but does not vacuum because the vacuum is too heavy. (Id.) She cooks, goes shopping, and does the laundry. (Id. at 44.) She testified that her boyfriend carries the groceries and laundry basket because they are too heavy for her to carry. (Id. at 44-45.)

In addition, Rock filed a Function Report with the Administration in which she detailed some of her daily activities. In that report, Rock stated that she tries to do light housework but always is in pain. (Id. at 163). She feeds her dogs. (Id.) She dresses herself, but it is very painful for her. (Id. at 164.) She cooks and prepares food. (Id. at 165.) She does dishes. (Id.) She goes shopping for a half an hour to an hour at a time, although her boyfriend carries the grocery bags. (Id. at 166.) She pays bills, counts change, handles a savings account, and uses a checkbook or money orders. (Id.)

C.     Testimony of Medical and Vocational Experts

The ALJ heard testimony, in addition, from Dr. Stephen Kaplan, M.D., who is under contract with the Commissioner to provide expert medical testimony. (Id. at 22.) He is a doctor who is board-certified in rheumatology and internal medicine. (Id. at 22-23.) In his decision, the ALJ stated that he found Dr. Kaplan to be credible and reliable and noted that his was the only medical opinion in this case that was informed by a review of the entire medical record of Rock. (Id. at 11 n.1.) Dr. Kaplan testified that Rock could probably spend two hours on her feet during the course of an eight-hour workday as long as she was not required to do anything of significance. (Id. at 30.) He opined that she would be capable of sedentary work even where he considered all of Rock's impairments in combination. (Id. at 29.) He said that he did not notice in the record any doctors indicating concern about any particular side effects arising from Rock's medications, although he did note that certain of those medications could have some side effects. (Id. at 31.)

The ALJ heard testimony also from Paul Murgo, a vocational expert. The ALJ asked the vocational expert to consider a hypothetical claimant who had the same age, education, and background as Rock and who had residual functional capacity for work at the sedentary level, could lift ten pounds occasionally, lift lighter weights more frequently, could perform the two hours of walking within the definition of sedentary work, could climb stairs or ramps occasionally, who would be limited to unskilled work by deficits in her concentration and attention, and who could not be on her feet for more than ten minutes at a time and could not engage in activities that would require squatting, crouching, crawling, or climbing ladders. (Id. at 52.) The expert opined that the hypothetical claimant could not perform Rock's previous jobs as a fisherman or a newspaper warehouse worker because those were medium- and heavy-exertion positions. (Id. at 52-53.) He further opined that there were other available jobs that the

9


hypothetical claimant could perform in the Rhode Island and Southeastern Massachusetts areas, specifically, approximately 10,000 assembly positions, 5,000 inspection positions, 2,500 production laborer positions, and 6,000 machine tender positions. (Id. at 53.) The expert said that his testimony was consistent with information in the Dictionary of Occupational Titles and Selected Characteristics of Occupations ("DOT"). (Id.) The plaintiff's attorney cross-examined the vocational expert. The attorney did not ask him to provide code numbers from the DOT referenced by the expert. (Id. at 53-56.)

## II.  Discussion

The Social Security Act provides that findings of the Commissioner are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g); see Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). The Court thus must uphold the Commissioner's findings if they are supported by such evidence, that is, evidence that "a reasonable mind . . . could accept . . . as adequate to support [a] conclusion." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The Commissioner's findings may be supported by substantial evidence "even if the record arguably could justify a different conclusion" from the one reached by the Commissioner. Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). "It is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence." Ortiz, 955 F.2d at 769.

In deciding a claim for disability benefits, the Commissioner applies a five-step sequential evaluation process. See 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.905(a); Seavey v. Barnhart, 276 F.3d at 5. The steps are: 1) if the claimant is engaged in substantial gainful work activity, the Commissioner will find the claimant not disabled; 2) if the claimant does not have a severe medically determinable impairment, the Commissioner will find the claimant not

disabled; 3) if the impairment meets or equals one of the "listed" impairments in the Social Security regulations, the Commissioner will find the claimant disabled; 4) if the claimant's "residual functional capacity" is such that he can still perform his past relevant work, the Commissioner will find the claimant not disabled; 5) if the claimant, given his age, education, work experience, and residual functional capacity, can make an adjustment to other work, the Commissioner will find the claimant not disabled, but if he cannot make such an adjustment, the Commissioner will find the claimant disabled. 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). For that fifth and final step, the Commissioner "has the burden of proving the existence of other jobs in the national economy that the claimant can perform." Ortiz, 890 F.2d at 524.

    A.    The Opinion of Dr. George

Rock argues that the ALJ improperly ignored the opinion of Dr. George, who was a treating physician and Rock's primary care physician, and that the Commissioner's ignoring of Dr. George's opinion requires that his decision be reversed and remanded. The Commissioner, on the other hand, argues that the ALJ's decision was supported by overwhelming medical evidence and that his opinion therefore should be affirmed.

It is the Commissioner, not any particular doctor, who is responsible for determining whether a claimant is "disabled." 20 C.F.R. § 404.1527(e)(1); 20 C.F.R. § 416.927(e)(1). The Commissioner need not "give greater weight to the opinions of treating physicians" or "accept the conclusions of [a] claimant's treating physicians on the ultimate issue of disability." Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991). Nevertheless, the Commissioner generally will "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 404.1527(d)(1); 20 C.F.R. § 416.927(d)(1). The Administration emphasizes that "opinions from any medical source about issues reserved to the Commissioner must never be ignored, and that

the notice of the determination or decision must explain the consideration given to the treating source's opinion(s)." SSR 96-5p, 1996 WL 374183, at *1 (1996). The Administration states: "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2).

In the present case, Dr. George examined Rock on a number of occasions over the course of many months. (See R. at 278, 484, 489, 494, 495, 497, 499, 501, 503.) After an evaluation of her on November 8, 2007, he concluded that she could neither sit nor stand for more than thirty minutes. (Id. at 484, 486.) After an evaluation of her later that month, he concluded that she could not stand, walk, or sit for more than thirty minutes. (Id. at 511, 513.) In both situations, Dr. George opined that she "has a physical and/or mental impairment(s) that does not meet or equal the Department's Medical Standards or the SSI Listing of Impairments but does affect ability to work and is expected to last" six to twelve months. (Id. at 483, 510.)

In his decision, the ALJ did not refer to Dr. George's opinions. It would have been preferable if he had. However, Dr. George's opinion was that Rock's impairments did not fall under the SSI Listing of Impairments and that he expected her impairment to last from six to twelve months and that he did not expect it to last for more than one year. (Id.) Under the Social Security statute, an impairment can qualify as a disability where the impairment "can be expected . . . to last for not less than 12 months." See 42 U.S.C. § 416(i); 42 U.S.C. §423(d)(1). Dr. George did not make that assessment.

Rock emphasizes Dr. George's estimate at the end of 2007 and the beginning of 2008 that she could not sit or stand for more than thirty minutes. The ALJ had strong reasons not to give that assessment much weight. It was incompatible with a great deal of other medical evidence from both before and after those estimates, some of it objective. For example, Dr. Katz's MRI in June 2007 of Rock's sacrum and coccyx was unremarkable. (R. at 244.) A month later Dr.

12

Jaslow's examination observations were inconsistent with Rock's subjective claims of difficulty sitting. (Id. at 245.) Similarly, after Dr. George's assessments, in March 2008 Dr. Stern's examination found full range of motion in both knees, with good stability on the left and some decreased stability on the right. (Id. at 528.) In April 2008, Dr. Kippe noted mild degenerative changes and recommended conservative treatment. (Id. at 586, 520.) Later, Dr. Kippe urged Rock to participate in physical therapy to reduce her symptoms. (Id. at 525; see also 524, 526.) In July 2008, Dr. Stern noted mild knee tenderness and mild instability in the right knee, but a full range of motion in both knees. (Id. at 529.) MRI tests in August 2008 showed mild degenerative disc, facet, and uncovertebral changes and mild neuroforaminal narrowing but no significant central canal narrowing. (Id. 532-537.) In October 2008, a neurosurgeon, Dr. Marcovici, concluded that Rock's pain was unrelated to any specific spinal disease. (Id. at 617.) And so on. Dr. Kaplan carefully and in detail set forth the medical history at the hearing before the ALJ. No one, including claimant's counsel, addressed Dr. George's assessments.

In short, any error by the ALJ in failing to specifically address Dr. George's assessments in the decision was harmless in light of the entire record, which provides ample support, most often from specialists, for the ALJ's conclusions.

    B.    The Opinion of Dr. Sheridan

Rock argues that the ALJ improperly rejected Dr. Sheridan's opinion that Rock could not work an eight-hour day. More specifically, she argues that the ALJ had to consider all available evidence, and the opinion of Dr. Sheridan was among that evidence. She further argues that, although chiropractors such as Dr. Sheridan are not "acceptable medical sources" according to the Administration, they nevertheless may provide insight into the severity of the impairments and into the affect the impairment has on an individual's ability to function.

In the present case, the ALJ did specifically consider Dr. Sheridan's testimony. He decided, however, to give that testimony limited weight and supported that decision in two ways. First, he stated that Dr. Sheridan's opinion "is not supported by a reasonable precise functional assessment which is supported by clinical findings, and the other medical evidence of record." (R. at 15.) Second, he noted that Dr. Sheridan, as a chiropractor, is not "an acceptable medical source." (Id.) Rock herself acknowledges that an opinion from accepted medical sources may deserve greater weight than opinions from others. (See Pl.'s Mem. of Law in Supp. of Reversal of Comm'r's Denial of Benefits 17 ("the opinion of an acceptable medical source may deserve greater weight than that of a medical source who is not an acceptable medical source . . . .").) Furthermore, the ALJ had discretion to give greater weight to the testimony and reports of other medical experts. Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 n.1 (1st Cir. 1988); see also Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). Accordingly, the ALJ's opinion to give Dr. Sheridan's opinion only limited weight was well supported and well within the discretion of the ALJ.

### C.   The Plaintiff's Credibility

Rock argues that the ALJ, in three separate ways, erred in his evaluation of Rock's credibility.

First, Rock argues that the ALJ failed to consider both objective and subjective evidence and more specifically, that the ALJ, in his evaluation of Rock's complaints, failed to evaluate her complaints properly in the context of Avery v. Sec'y of Health & Human Services, 797 F.2d 19 (1st Cir. 1986).

In his determination of a claimant's credibility, an ALJ should consider, among other things, the claimant's daily activities; the location, duration, frequency, and intensity of her symptoms; precipitating and aggravating factors; treatment other than medication she has

14

received for her symptoms; other factors concerning her functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3); see also Avery, 797 F.2d at 22-23. An ALJ may consider these factors — "the Avery factors" — without specifically mentioning them in his written decision. N.L.R.B. v. Beverly Enters.-Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999). His decision must, however, "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual . . . the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (1996).

In the present case, the ALJ considered both objective and subjective evidence, directly addressed most of the Avery factors, and presented specific reasons for his findings on credibility. The ALJ noted Rock's complaints of pain especially in her joints, her knees, and her back. (R. at 11-13, 15.) He detailed a number of her medical appointments and the doctors' analyses of her conditions. (Id. at 11-12.) He noted, among other things, Rock's assertion that she could only sit ten minutes and stand ten minutes. (Id. at 14.) His concluded that her limitations were less severe than she alleged and that she was capable of doing sedentary work. (Id. at 14.) He supported those conclusions with substantial evidence in the record. For instance, he noted that her pain stems from degenerative joint disease and a chronic pain syndrome, that Rock had not required hospitalization or surgery, that she performed household tasks (that include cleaning the apartment, doing laundry, preparing meals, and going shopping), and that a medical expert opined that Rock would be able to perform sedentary work activity. (Id. at 14-15.) In sum, the ALJ adequately considered both the objective and subjective evidence in this case, adequately considered the Avery factors, and adequately provided specific reasons for his conclusions regarding Rock's credibility.

Second, Rock further argues that the ALJ was required to consider her activities of daily living and that an assessment of those activities — which, she argues, she could do only for brief, episodic periods — does not support the conclusion that she was able to engage in substantial gainful activity. Rock's argument here cannot prevail. There is no dispute that the ALJ can and did consider Rock's activities of daily living. He considered these activities in conjunction with a number of other factors including testimony from Dr. Kaplan, admissions from Rock, and reports from treating physicians. (Id. at 15.) From this conflicting evidence, he drew a conclusion, as he was entitled to do, that was unfavorable to Rock. Ortiz, 955 F.2d at 769.

Third, Rock argues that the decision did not fairly reflect the severity of Rock's symptoms and argues, in particular, that the decision failed to discuss her difficulties in sitting for prolonged periods. To the contrary, the decision did discuss her difficulties. (See id at 13 ("[T]he claimant alleges in the record that she experiences back problems [and] knee problems . . . that caused marked limitations in sitting . . . ."); id. at 14 ("The claimant testified that she was only able to sit 10 minutes, and stand 10 minutes."); id. at 14 ("The alleged limitations in sitting . . . are not substantiated by competent medical evidence to the degree alleged.") Although he concluded that her limitations were not as severe as she alleges, the ALJ supports his conclusion through, among other things, evidence of her lack of hospitalization and surgery, her daily activities, and medical expert testimony. (Id. at 14-15.) He supported his conclusions with substantial evidence. See Seavey, 276 F.3d at 9.

### D.   The ALJ's Functional Capacity Assessment

Rock argues, in addition, that the ALJ's functional capacity assessment was not supported by substantial evidence. That is, the ALJ found that Rock had the residual functional capacity to perform unskilled sedentary work, and Rock argues that this finding was flawed for several reasons. First, she argues that it was flawed for the arguments presented above. Those

arguments did not prevail above and do not prevail here either. Second, she argues that it was flawed because the ALJ did not consider the impact that Rock's obesity had on her pain. To support her argument, Rock quotes the Administration's Policy Interpretation Ruling SSR 02-1p: "The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." SSR 02-1p, 2000 WL 628049, at *6 (2002). Rock fails, however, to highlight any record evidence that her obesity aggravated her conditions. Furthermore, one of her doctors repeatedly directed her to lose weight. (R. at 490, 492, 493, 502.) Her failure to follow his directions undermines her claim for disability benefits. Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 534 (1st Cir. 1988) ("Implicit in a finding of disability is a determination that existing treatment alternatives would not restore a claimant's ability to work."); see also 20 C.F.R. § 404.1530(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."); 20 C.F.R. § 416.930(a) (same). Similarly, her failure to undergo the physical therapy ordered by her doctors also undermines her claim for disability benefits. (R. at 523-24.)

      E.      Step Five of the Sequential Evaluation Process

Rock next argues that the ALJ did not have sufficient legal foundation to establish that Rock could perform a significant number of jobs in the regional economy. Specifically, Rock seems to argue that the ALJ or the vocational expert who testified at the hearing should have provided codes from the DOT for the jobs that Rock allegedly could perform. This was not an issue raised at the hearing, where Rock was represented by counsel. The issue is thus deemed waived. Mills v. Apfel, 244 F.3d 1, 8 (1st Cir. 2001) ("it could cause havoc, severely undermining the administrative process," if issues not raised before the ALJ are not considered

waived); see also Edwards v. Sec'y of Health & Human Servs., No. 94-1345, 1994 WL 481140, at *3 (1st Cir. Sept. 2, 1994) (applying "ordinary rule that appellate courts will not consider issues not raised below" where claimant failed to object when vocational expert assigned only general job titles and not DOT code numbers to his testimony).

### III.   Conclusion

For the foregoing reasons, the plaintiff's Motion for Order Reversing the Decision of the Commissioner (dkt. no. 13) is DENIED, and the defendant's Motion for an Order Affirming the Decision of the Commissioner (dkt. no. 15) is GRANTED. The decision is AFFIRMED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge